Go ahead. Thank you. Good morning. My name is Joseph on behalf of Roderick Reed, and I'm going to take about five minutes of the time for this is I'd like to address the situation regarding the CDC information. In all my years as a defense counsel, and I do have a lot of them, not as much as Ferguson, but I do have a lot of them. Yeah, I appeared in front of you, I appeared in front of your son. Yeah, well, you're you're holding up well. Thank you very much. I've never seen a wiretap with so many unexplained problems. And when I tried to cross check calls on the wiretap against the itemized phone bill, it didn't match. I subpoenaed more phone bills. And for some inexplicable reason, there were big chunks missing from the billings. In other words, somehow there was a cell phone that didn't have any billings on it. On top of that, I discovered that the phone number that was being used by the defendant was formerly owned by the Long Beach Police Department, which is one of the people who were law enforcement that were examining this. So I made a motion to the court to allow me to hire an expert. And we hired an expert called Ben Levitin, who is a telephony expert. When I heard that, I thought, sounds like a phony guy. You know, I never heard telephony before. But apparently that is his title. He worked for Nextel. And he discovered other things in terms of explaining the law enforcement agencies demand CDC information that comes with the recordings when the telephone provider complies with the court order. And law enforcement demands this information to confirm that the phone call arrives over the line, which is authorized to be intercepted, and to identify the time and origin and other technical aspects of the call. What he found was there, for example, there was dial tones on the phone. And there is no dial tones on cell phones. That much I know as a layman. And so he found more things wrong than I found in terms of authenticating the phone calls. Testimony was that the CDC information arrived to law enforcement and is served on a computer disk. But it was never maintained in the records. It was never sealed. It was never given to the defendant. And I couldn't understand really how law enforcement can demand the information from the telephone provider and then turn around and tell the defendant it's not important enough to be provided to the defendant as incontrovertible proof of every wiretap call. So we're in a situation where we're claiming that there was a real problem with the authentication of the phone calls and put an expert in to try to assist us. And the issue for the court basically is this. Is the CDC information, this is the parallel information that comes with the wiretap, is that a recording? And the answer is I don't know. I couldn't find any cases on that subject. And that seems to be a case of first impression. Now, if it is a recording, then it's clear that it needs to be preserved.  And the whole point of sealing is that it authenticates the wiretap, that it's not a wiretap from some other phone and some other or illegal wiretap. And in this particular case, they completely failed to do that. I use the analogy, if I may, about the early days of the movies where it was silent movies. And, you know, then they added sound. So how do they add sound? At the beginning, they added sound by having like a record that would just play and sort of coordinate with what was on the screen. Eventually, both came on to the filmstrip and we have sound recordings that we have today. If you have a phone call from me to somebody and we want to authenticate that my phone was legally wiretapped, you use the CDC. This is as important as anything else. And in this particular case, when we asked for the CDC, it was destroyed, it was missing, whatever. It didn't happen. And it didn't authenticate it through that process. So I just present to the Court. And I've resolved. So are you really arguing then that they didn't meet the necessity requirements of 1825-18? It's not so much the necessity requirements. If it's a recording, then it needed to have been sealed. It needed to have been preserved. Well, they did file applications to seal recordings within one or two days. You're just suggesting that this particular thing was not – the question of whether it's a recording or not is something you're arguing. Yes. I understand. And if it is a recording, then they had a duty to seal that, the CDC information. Thank you very much. Thank you very much. Nice to see you, Your Honor. Nice to see you. Good morning. My name is Rob Farley. I'll be speaking on behalf of George Williams. And my arguments will be narrowly tailored to the issue we brought up on the constitutional right to a theory of defense instruction. And basically, the starting point for a theory of defense instruction is that it must be supported by the law and have some foundation evidence, which means more than a scintilla evidence, but it can be weak, inconsistent, and of doubtful credibility. There's no question that the defense instructions that should have been given are supported by the law. I'm arguing 5.1 should have been given. That's the aiding and abetting instruction. And 6.9 should have been given. That's the mere presence instruction. So as far as the first prong for giving the instruction, as far as being supported by the law, I think it is amply supported by the law because it's in the Ninth Circuit Model Jury Instructions. Getting to the second phase, whether there's evidentiary support for the jury instructions, I would argue that there was certainly evidentiary support because it's just the court judge down below gave the aiding and abetting instruction 5.1 in connection with count 2, which was focused directly towards Mr. Reed, who was more involved than my client. But nobody objected to the aiding and abetting instructions, did they? That is true. So really we're in here on a plain air? In regards to that instruction, but we did object to the mere presence instruction, which I'm about to get to. I'm going to be arguing that obviously is supported by the law, and there also was evidentiary support for it. So as far as the mere presence instruction, again, I'm directing the Court's attention to 6.9. There was evidentiary support for that instruction because two of the three cooperators who testified against George Williams at the trial said he was just merely present. It was innocent presence. It was innocent association. They had nothing criminal to offer the prosecution. But, Counselor, when we're looking at jury instructions, we're not just going to focus in on one instruction necessarily. We want to have instructions given to the totality of the circumstances in front of the district judge. If we can find that the mere presence instruction was adequately covered by other instructions given on the conspiracy, then there isn't any problem, is there, on the district court level? That is true. I agree. And, in fact, because the government's case rested on more than just the defendant's presence, then we have to really look at what do all of the instructions say about what you're arguing is the issue in the mere presence instruction, correct? Yes, sir, I agree. And in that situation, we then have to tailor our review on the circuit, me being an old district judge in my old days and not anxious to have the circuit come down and take away what I thought was okay. So we're all pretty much district judges. And so we're looking at what was the overall instructions, are we not, and whether they cover your issue. Right. And why don't they? Because I looked them over, and, frankly, I believe that they adequately covered the mere presence instruction. Now, I'm saying that as a devil's advocate approach. Understood. I haven't necessarily made up my mind here. I'm just trying to give you the devil's advocate. Understood, and I appreciate that. If you look at 816, which was given, it does talk about knowledge and association. I can see, and you have to look at the finality of the instructions that were given. But if you look at the mere presence instruction, it goes a little bit further and talks about being a knowing spectator. That means somebody can be sitting there, seeing a drug transaction go down, knowing the drug transaction goes down, not taking any efforts to stop it, but yet they are not connected to that conspiracy because they're sitting there watching what's going down, as long as they're not an intentional participant. Well, but the elements of the crime were adequately given to the jury, were they not? Well, that's where I... I mean, we had adequate instructions about what the conspiracy was, what the situation, what the elements of the crime ought to be. We had other instructions, which you suggested, which lay out in general what the situation is. So I guess that's the reason I'm asking you the questions. Understood. That's where the aiding and abetting comes in. I realize there's no objection down below. But when you're talking about aiding and abetting, which the district court felt was substantial enough to warrant giving to the jury on the subsequent count, number two, in connection with Roderick Breed, that is the target offense that is the conspiracy in count one. So it seems to me it's somewhat inconsistent if the district court now is evaluating all the evidence down below and saying, oh, I have to give a sufficient evidentiary support to give an aiding and abetting instruction in connection with count two and not to give that in connection with count one because the substantive offense in count two is the target offense of the conspiracy in count one. So it seems to me we're missing an element of aiding and abetting when you talk about count one. I can see it was not requested, but I think you have to put that in the totality of circumstances when you're trying to figure out whether presence of concern by failing to give the mere presence instruction. Well, there are two things that bother me, and you've hit them both. One is failure to object below. Another is failure to offer any instruction. Now, I know you offered a mere presence instruction. Yes, sir. And they refused it. Yes, sir. So I understand that, and that's why I ask you these questions, because I'm now looking at the totality of the jury instructions that we have in front of us and whether they cover what you're suggesting is a problem. And that's why, even though there was no objection down below to the aiding and abetting not being given in count one, I think when you look at the totality of circumstances, you have to incorporate that into your analysis to see if the totality of the instructions given in connection to count one, because my defendant was not charged in count two or count three. So you look at the totality of circumstances, and when you're evaluating that, you have to consider the fact that there was no aiding and abetting instruction, even though it was not requested. However, when you look at the mere presence instruction, 6.9, it has better language for the defense, and aiding and abetting certainly has great language for the defense. Any defense counsel could have argued vigorously down below as far as knowingly and intentionally aiding and abetting the drug crime, and the requirement that Mr. Williams had to act with knowledge and the intent of helping another. So that's really powerful stuff for a defense attorney down below to argue if the district court judge had chosen to give the aiding and abetting instruction in connection with count one. And my argument is the fact that it was tailored to count two and three and not count one, there's an inference out there that the jury should disregard any aiding and abetting instruction in connection with count one. Now, you also have one other issue, or are you just going to jump that one? Well, which one? The Rule 11 application to Williams' admission. No, I can address that briefly. I mean, the honest truth is, as I understand it, an admission of a prior felony drug conviction is governed by Section 851B. And if you look at 851B, I think that Williams was given a proper 851B colloquy, and that any case can't be really shown to show prejudice where he did not challenge the validity of his prior convictions. Okay, I can see that is on the books, and I can see compliance with 851B. No question about it. But when a person's sitting in court and admitting to two prior 851 priors that mean life without possibility of any release, my argument is Wright v. Craven is still good law. I know it's an old case, a 1972 case, but it seems to me, relying upon that, there should have been some admonition about the constitutional rights that he's giving up in connection with the admission that means he's going to do the rest of his natural life without any possibility of release. Well, but the prejudice, given he didn't even challenge the validity of his prior convictions, is a tough one for you to overcome. That is true. But I would be willing to bet that if perhaps Mr. Williams knew that his admission was going to lead to spending the rest of his natural life without any possibility of release, maybe he would have had second thoughts about making it so easy for the prosecution, essentially rolling over the prosecution and admitting those prior convictions. Well, you're not really questioning whether Williams was given a proper 851B colloquy, are you? No, sir, I'm not. All right. I'm just saying there's some – I mean, when you're talking about life without possibility of release, there should be a constitutional requirement, and the case I have in support of that. I know it's an old case. I would urge the Court to consider that there has to be something more than a mere 851B colloquy, which is only statutory and does not address the constitutional rights he's giving up. Thank you very much. I appreciate it. Thank you for your argument. Good morning, Your Honors. Elisa Peterson for Defendant Richard Johnson. Johnson, my client, joined in many of the arguments, but he had a specific argument of his own, which was in regards to Detective Laib's testimony regarding drug jargon. And basically, when you have these wiretap cases and you have all these ambiguous conversations, you know, it requires somebody to interpret it, interpret the language. And in this case, Detective Laib did that, but he – there was no showing that he was qualified as an expert to testify as regards to drug jargon. He basically said that he was – What is your standard of review on that particular issue, Counselor? Well, it was objected to as far as – No, I'm not asking whether it was objected to. I'm asking what is the standard of review? Again, you've got three old district judges sitting here. One, we don't say, oh, she'd be mad. At least he's given me the possibility to say he is. And we know what the standard of review – when you're looking at an expert testimony, you're really looking at abuse of discretion. And the district judge is the one who stands on the cusp. I mean, we're not anxious to get involved in expert testimony disputes. We're suggesting that the district court has some discretion in those kind of things. And based on the – based on what was in the record, you're asking me to suggest that what was in this record is now an abuse of the judge's discretion to allow this person to be an expert. Now, you're suggesting there's not any evidence in this record which would provide foundation for this police officer to testify? Well, I think he – He did talk about, did he not, how long he'd been involved in the situation, how much he knew about the stuff? He – well, he wasn't very specific at all. Basically, he said that he was a lead detective representing the L.A. Sheriff's Department, and there were several agencies involved. Most of – as far as, you know, being recipient witnesses, those were other people. And he said that he recognized the voices of these defendants and he had some knowledge of some familiarity, you know, with the language. But that was about it. He really did not say how many years he'd been dealing with these things, how many cases he had, you know, none of these things. It was just very vague. And so based on what you're suggesting there, you're saying that I'm supposed to say that the district judge, who was sitting there on the case, listening to the evidence, hearing what the witness said, hearing what the situation was,  abused his discretion to let him talk as an expert? That's right, because even if it's abuse of discretion standard, it doesn't mean that the reviewing court can't review this. And I really believe that this – Well, but we don't review it for whether we think it's right or wrong. We review it for abuse of discretion. In other words, they have a little latitude here. And that's why some of our cases, when they're cited to us, they are cited to us as a general set of law, but that's not what we're really saying at all. We're just saying the judge didn't get outside the discretion he could have used. We may not even get there. In fact, the Honorable Pregerson, who sat a lot of time as a district judge, may never have let that person testify. But it's not his decision. Our decision is based on given the wide latitude of discretion of the judge. I understand, Your Honor. And, like, you know, it's our position that there just wasn't enough evidence. It was abuse of discretion. But also there's the separate problem of what he's testifying as a lay and expert witness, and that's another issue. But doesn't that happen in every case? I don't know how many civil cases you have, but we have family practitioners who go through and they talk to the person who's just been in an accident, and when they're giving their testimony as the family practitioner about what his injuries were when he came to see him and what he did, they're lay witnesses. But then when they go to say, well, this is the prognosis, and we're going to now tell you how long it's going to be, they become expert witnesses. That happens in almost every civil case. Why is it abuse of discretion for that not to happen in a criminal case? Well, I think you have further considerations when you have a criminal defendant. Well, I don't know. The standard of review for an expert witness doesn't change just because of the case. Okay. Well, I also have some other issues regarding the wiretaps, so I think I'll move on to that. Well, do you want her to do that because the time is up? Well, let her go. He's the boss, so I always thought you would think I was the boss. Okay. But, you know, these young'uns are hard to tame sometimes. Go ahead. This is true. I mean, these are not easy cases, and particularly when you have multiple defendants and the jury's got to keep them all straight and get the testimony straightened out. Do we have diagrams in this case during argument, closing argument? That's right. It's almost too complicated to talk about, but I just briefly wanted to say. And I have to tell you, you can go ahead. The only reason that I stopped you a little bit, I know I took you over your time, so I didn't want him to say, come on, Smith, you geek. Sooner or later, they'll confess. I appreciate it, Your Honor. I appreciate the time, Your Honor. Oh, yeah. But basically, it was just in regards to the necessity requirement. The argument there is just that the target of Target Telephone 10 was actually Jackson, but in the application it said it was Reed. And so all the facts establishing necessity was in regards to Defendant Reed, and that's why we believe necessity was not established. But the probable cause for this kind of a wiretap is not because of a person. It's because of a telephone, isn't it? Well, I would argue that really that in reality it is in regards to the person. And any person where there's probable cause to believe that they're engaged in criminal activity should be mentioned in the application. And they found out at the time of the interim report that Jackson was involved in this activity. That's why they said that Jackson was a target. Therefore, since there was probable cause that she was engaged in criminal activity, they should have had a different application under her name and established necessity. Well, wasn't the wiretap confirmed? Didn't the wiretap confirm that TT10 was used by Reed and others in furtherance of the conspiracy? I mean, the probable cause for the wiretap was that the telephone was being used to commit the offense. And then the wiretap confirmed that TT10 was used by Reed and others in furtherance of the conspiracy. So how does that – I mean, I guess I have a tough time with your argument. I guess the argument is just that since there was probable cause that this particular person was engaged in criminal activity, they should have mentioned as a target. And that's all I have to say. Okay. Thank you very much, Your Honor. Thank you. Good morning, Your Honor. Shannon Ryan for the United States. Addressing each of Defendant's contentions in turn. First, with regard to Defendant Reed's arguments regarding the CDC information and the allegation that there was missing information and this information was not sealed nor was it disclosed to the defense, if I could just focus on the facts for a moment. In this case, the district court found, in fact, that the information that the government had, the CDC information, was disclosed to the defense. That is at Defendant Reed's excerpts of record 637. Although the defense is correct that there is missing CDC data, the government has presented credible evidence that the missing data is not the result of foul play or destruction. The court is persuaded that the government has turned over the data that it succeeded in capturing. So in other words, the CDC data that the government obtained and was in its custody was produced to the defendants in advance of trial. And that seems clear from the record, Your Honor. The issue regarding the sealing. Is that a factual determination? That is a factual determination, Your Honor. So in that instance, what do we have to have as a standard of review for that? Well, in that instance, it would be whether the district court's finding was clearly erroneous. And the government submits that it was not. In particular, the district court made some credibility findings as to the defense expert, Ben Levitan. And that's just a few pages before that conclusion, Your Honor. But the district court said before, I'm paraphrasing, before I heard from the government's testimony, excuse me, was not persuasive that there was any sort of destruction or foul play. The district court said that she, just being a layperson, could explain gaps in data quite easily, that there were common sense explanations for that that didn't bear out the defense expert's testimony. So as to the capturing of the CDC data and the preservation of the data that the district court had and the production of that to the defense, the government submits that it's clear that the government complied with all of its obligations. As to the sealing, which is the issue defendants focus on in their briefs, the government submits that it's quite clear that there is no sealing requirement as to the CDC data. In Defendant Reed's argument before this Court, counsel focuses on whether or not the statute, sealing applies only to the contents of any wire, oral, or electronic communication. And this data is not the contents of any communication. This data is simply information such as the length of time of the call, when the call was placed, the subscriber information for the receiving a call from or making a call to, data of that nature that it has long been held. The telephone user has no expectation of privacy in. Moreover, the premise behind the sealing requirement as to the audio that the government collects is to prevent alteration or any sort of foul play with regard to evidence that is otherwise not obtainable. The only record of audio calls when the government is conducting a wiretap is the recordation that the government keeps. And so that recordation must be preserved as the only available evidence. With regard to CDC data, the phone company, separate and apart from the government, has records, billing records, and other records that it keeps concurrent with any recordkeeping or evidencekeeping that the government conducts. And so for those several reasons, along with the plain face of the wiretap statute, sealing simply does not apply to this kind of data. With regard to Defendant Williams' arguments on the jury instructions, Your Honors, the aiding and abetting instruction, Defendant Williams did not object below that no aiding and abetting instruction was given in connection with the conspiracy count. In fact, as to each of the substantive elements of the conspiracy count, there were no further instructions given. The Court gave the common conspiracy instruction. As to the later counts, counts 2 and 3, the Court provided substantive instructions. In this instance, it's hard to say that there was any plain error, that there was any confusion at all, really, as to failure to give the aiding and abetting instruction. In fact, the aiding and abetting instruction would have been a government theory of liability, not a defense theory at all. And as to the mere presence instruction, there was objection below to the failure to give this instruction. The district court found, and this is amply supported by the evidence, it's reviewed de novo by this court, but it's amply supported by the evidence, that Defendant Williams' case was not one of mere presence. The government had extensive evidence that Defendant Williams was involved through the testimony of one of its cooperators in receiving PCP from Defendant Reed through another person. There were wiretap calls. Excuse me. The cooperators who testified that they were not aware of Defendant Williams' involvement didn't actually testify that he was merely present. One of them, Cooperator Henderson, said that he had known Defendant Williams to be an associate, a friend of Reed, but didn't know him to be involved in any illegal activities. Cooperator Shane Williams said that he didn't know Defendant Williams at all. And so the theory of Defendant Williams' defense factually was, excuse me, that he may have been involved in some sort of drug dealing. That was clear from the telephone calls. But it wasn't with Defendant Reed. He was not a member of this conspiracy in any way. And, in fact, the conspiracy So is your argument that the district court could properly refuse the instruction when your case rested more than just on his presence, or is it that the mere presence was adequately covered given the instructions? Both. Our primary argument, Your Honor, is that the district court could and did properly refuse the instruction, given the facts of this case, that they didn't mete out a mere presence defense. And, in the alternative, that the jury instructions adequately, taken as a whole, adequately informed the jury of any type of given the instructions on the conspiracy itself. Correct. And, in fact, in counsel's argument, he mentioned Well, read me that language that would have substituted for the mere presence instruction. Yes, Your Honor. As to the conspiracy count, the instruction specifically stated that a person does not become a member of a conspiracy merely by associating with other members or knowing that a conspiracy exists. And that's a Defendant Williams excerpt of record 1914. In fact, in counsel's argument, that's exactly what he focused on. Well, if counsel would have, in argument, would have argued mere presence, mere presence does not constitute the commission of a crime, would you have objected to that? No, Your Honor. I mean, that, that I think would have been a And there was certainly evidence in the record that supported that conclusion, wasn't there? There was evidence in the record that And that's a jury question. It was a jury question as to whether or not Defendant Williams was a member of this But the mere presence, in other words, Defendant Williams being present when Defendant Reed conducted a drug deal, but not really being involved in the drug deal, those, those weren't the facts that played out here. The facts that played out here were Defendant Williams in telephone calls on the wiretap, and Cooperator Stinson saying that Defendant Williams received deliveries of PCP. And so in, in this case, the facts did not bear out a mere presence defense. And as I said in response to Your Honor's question, to the extent that, that there was any sort of factual merit to that, the conspiracy instruction provided exactly what counsel seeks in the, in the aiding and abetting theory. With regard to Defendant Johnson's claims regarding Detective LeBay's testimony regarding drug jargon and the necessity requirement for the wiretap. Concerning the qualifications of Detective LeBay, there was actually no objection to his qualifications below. There were objections to two of his statements regarding drug jargon. As to his qualifications, which counsel now focus on, there was no objection. And so that would be reviewed for plain error. And the government submits that Detective LeBay's experience as a narcotics investigator, his extensive involvement in this investigation, and in a related investigation of, of Defendant Reed that was run by local law enforcement officers, that that evidence clearly supports his qualifications. In fact, in the Freeman case, which is, is the dispositive case on this issue, the Court addressed similar qualifications of, of the law enforcement officer in that case and found those to be sufficient qualifications. And in, and in Freeman, an objection had been made, as opposed to here, where no objection was made to Detective LeBay's qualifications. Regarding his testimony and his dual role as an expert and lay witness, the Federal Rule of Evidence 702 and the advisory committee notes expressly contemplate this very type of testimony, that a law enforcement officer not only can testify as to his or her recipient knowledge of what goes on in a drug investigation, but many of the terms that drug dealers use are beyond the purview of, of jurors. So, for example, one of the, the examples here to which defendants did not object was Detective LeBay explained that when the defendants were referring to bird up there, they were, in his opinion, referring to a police helicopter that was conducting surveillance. And that testimony was based on, among other things, the wiretap calls that he had intercepted, his knowledge that there was also police surveillance being conducted with a helicopter, and those sorts of things which, to a lay person who is not involved in any sort of law enforcement activities or drug dealing themselves, this is totally beyond their knowledge and, and is quite rightly the subject of expert testimony. The jury, by the way, is free to... An aircraft being referred to as a bird? Yes. Bird up there. That, that, that is something that drug dealers would be conscious of, that they, that they would be discussing that sort of police surveillance in an attempt to avoid detection. Well, that's a military term as well. And I didn't know that, Your Honor, because, because as a, as a lay person with regard to military matters, that's, that's beyond my purview. So that and other instances of Detective LeBay's testimony were the government submits properly before the jury. And by the way, even though an expert... I thought prosecutors knew everything. Not, not hardly, Your Honor. Was this case diagrammed for the jury? Was it diagrammed for the jury? Yes. I, I wasn't the trial assistant, Your Honor. But I believe it was diagrammed and, and, and discussed to the nth degree from, from what I've, I've seen. But yes, it was diagrammed and there were wiretap calls. With regard to this expert testimony, not only did Detective LeBay testify appropriately, but one thing that I think has been omitted from the briefs is the jury's free to disregard his testimony. I mean, if they find an expert to be not credible, just the same as any other witness, then, then don't believe him. You know, if you think he's way off the mark when he says, you know, these terms mean drug jargon or they mean that defendants have knowledge of their criminal activities, then the jury's free to disregard that. So, in this case, and, and in this case, most of it is subjected to plain error review because, of course, defendants did not object. So, for all of those reasons, the government. That is somewhat disputed by the opposition, however. Isn't, isn't it that they didn't object? Well, they objected to two instances, Your Honor. The initial discussion came up when Detective LeBay was testifying and Defendant Johnson's counsel interceded and said, I'm going to start objecting. Defendant Johnson's trial counsel said, I'm going to start objecting. And the district court said, by all means, you know, make your objections. And then there were two objections that were made, both by Defendant Johnson's counsel, one of which was sustained by the district court and no motion to strike was made, and then the second of which was overruled. So, as to those, certainly that was an abuse of discretion. I should say, as to that one, it's an abuse of discretion standard. And as to the rest, it's plain error. But under any standard, the government submits this was appropriate. Well, that's the reason that I questioned counsel about the use of discretion error, because I'm sure that based on the objections made, that they had to be foundation-type objections, even though the court overruled one of them. Yes. And then finally, just touching on the wiretap issue, as to necessity, this issue of whether there was probable cause as to Terry Jackson. It's undisputed that at the time, the government made application to the district court for this wiretap. The government did not know that Terry Jackson was an associate of Defendant Reed, did not know Terry Jackson was involved in drug dealing, did not even know whether or not a Terry Jackson existed, or whether that was just simply a ruse name in which this phone was kept, which is common practice among drug dealers. So as to the original affidavit, there does not seem to be any basis for challenge to the probable cause or necessity set forth therein. Then, within hours of conducting the interception, the government intercepts calls in which Terry Jackson, or I should say at the time it was someone the government knew only as Terry, but a Terry person, is conducting calls with Reed and with known associates of Reed, clearly talking about the target offenses, drug dealing. The defense admits that at that point, the government was required to stop interceptions and prepare a new affidavit and say, now we're investigating Terry Jackson. And in fact, that's just not the case. I mean, the entire purpose of a wiretap is to find unknown associates to further the investigation in a way that traditional investigative techniques could not. So in this case, so long as the interceptions concerned the specified target offenses, so long as they were within the scope of the original wiretap order, and they clearly were, there's no claim that they were not, the government was properly intercepting them. And in fact, the district court found there was no illegal wiretapping occurring at all, correct? Correct. The district court made that finding. And the government went, in fact, beyond its obligations and filed an early interim report to the district court who had issued the wiretap, setting forth these calls, saying, you know, we were not aware of Terry prior to these interceptions, but we are now, and requested permission to continue interceptions, which the district court authorized. But there simply is no requirement that when a new and additional associate is uncovered on a wiretap that the wiretap cease. I mean, that's the purpose of the wiretap, is to uncover these new associates. All right. You want to cede your remaining time to defense counsel?  Unfortunately, it's only a few seconds, Your Honor, but I'll do that. Well, they'll appreciate your generosity. Thank you. Does anyone want to rebut? Just a couple of words. The fact of the matter is that the CDC information was lost. It's not a situation where the government turned over all the CDC information. In fact, the expert said he couldn't make a definitive ruling on whether it was illegal wiretap or not because all of this CDC information was missing. I just wanted to correct that. All right. Thank you. Mr. Harley? I was just reviewing counsel's argument down below, wherein it contains about 20 pages, and the theme, the consistent theory throughout the final argument is that the government doesn't have enough evidence Mr. Williams conspired with these defendants for, aided and abetted them, to sell or make PCP. And then she concludes that we can't convict Mr. Williams unless we want to make things like poor judgment, choosing our friends badly, listening to friends talk about plans, maybe not such wise plans and things like that. So I would submit, based on her 20 pages worth of final argument, this mere presence, this mere association, this mere knowledge argument certainly would have bolstered her credibility when she's standing up there arguing these things before the jury. So, and again, I refer to excerpts of record 1973, excerpts of record 1962. So I think obviously that demonstrates the presidential impact of refusing to give that request of instruction. Thank you. You know, you remember the name of that, it's an ongoing TV program where you have a woman detective that's good at going into the interrogation room and getting a confession. I don't remember the name, but I would be susceptible to that tactic, Your Honor, I'm sure. No, no, no, no. I was going to just say that you remind me so much of one of the detectives in that TV series. Uh-oh. I'm afraid to ask. No, you really, you do. You move like him. You talk like him. He's a very good looking detective. Oh, okay. Thanks. Thanks. Very popular guy. I'll think of his name. Usually when a judge compliments me, something bad's going to happen to me. Thank you. Thank you, Your Honor. Very good. All right. Judge Carter's waiting for you. Yes, sir. I will. I'll speak back. Yeah. Okay. You, too. Just to clarify in regards to the objections, what the trial counsel, Johnson's attorney, said was this witness is interpreting phrases on the phone calls, and that's improper. He can't, as an expert, give testimony in coded language. That was on page 155 of the reporter's transcript. And then this witness can't give expert testimony in coded language. This witness has been allowed to give improper expert testimony, and that was on page 156. But the problem that I had with those objections, and I didn't get into it with you because I was waiting to see what the government argued, they were a little late, weren't they? There was already a lot of stuff in there, and I didn't see one motion to strike. Not one. Basically, it wasn't in regards to Mr. Johnson, Mr. Johnson at first, and he wasn't identified as an expert by the other side, so anyway. But there was a lot of stuff in there about what these words meant and what they didn't mean before we had an objection by the top of the council about not being properly able to give those. Then, they never had a motion to strike any time. Okay. Well, at least it was some objection by Johnson. Yeah. Okay, well, thanks for coming here this morning, and have a good day. It's nice to see you again, Mr. Varney. How old are you now? I'm 78, Monday. Oh, you're just a kid. Monday, huh? Monday. What date was Monday? October 27th. October 22nd. 27th. It's this coming Monday. This coming Monday. Oh, this coming Monday. I'm still young. I see. Coming up. It's a pleasure to see you again. It's a pleasure to meet you, Mr. Clark. Good luck to you. Thank you.
judges: Pregerson, Hall, Smith